UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MISTY DAWN REITZ; AND NICHOLAS IVEY,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>PROGRESSIVE DIRECT INSURANCE COMPANY, an Ohio Corporation registered to do business in the State of California; and DOES I through CC, inclusive,<br><br>　　　　Defendants. | No. 2:14-cv-1614-GEB-EFB<br><br>**ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S SUMMARY JUDGMENT MOTION, AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S REQUEST FOR AN ORDER TREATING SPECIFICIED FACTS AS ESTABLISHED** |

　　　　Defendant Progressive Choice Insurance Company[1] ("Progressive") moves under Federal Rule of Civil Procedure ("Rule") 56 for summary judgment in this insurance dispute between Progressive and Plaintiffs Misty Dawn Reitz ("Reitz") and Nicholas Ivey ("Ivey") on their breach of contract claim and breach of the implied covenant of good faith and fair dealing claim. (Def.'s Mot. for Summ. J. ("Mot.") 11:12-16, 12:12-13, ECF No. 33.) Progressive seeks in the alternative "an order specifying for the purpose of trial that Plaintiffs are not entitled to damages over the liability limit specified in the

---

[1]　Since Defendant states in the motion that it is erroneously sued as "Progressive Direct Insurance Company," it is referred to herein as "Progressive Choice Insurance Company." (Mot. 2.)

1

insurance agreement." (Mot. 3:27-28.) The insurance dispute concerns whether Plaintiffs made material misrepresentations concerning the alleged theft of their insured 2006 Ford Mustang (the "Mustang").

## I. LEGAL STANDARD: SUMMARY JUDGMENT

> A party is entitled to summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." . . . The moving party has the burden of establishing the absence of a genuine dispute of material fact.

City of Pomona v. SQM North Am. Corp., 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "A fact is 'material' when . . . it could affect the outcome of the case." Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A "dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)-(B).

Further, Local Rule 260(b) prescribes:

> Any party opposing a motion for summary judgment . . . shall reproduce the itemized facts in the [moving party's] Statement of

2

     Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial.

If the nonmovant does not "specifically . . . [controvert duly supported] facts identified in the [movant's] statement of undisputed facts," the nonmovant "is deemed to have admitted the validity of the facts contained in the [movant's] statement." Beard v. Banks, 548 U.S. 521, 527 (2006).

"Because a district court has no independent duty 'to scour the record in search of a genuine issue of triable fact,' and may 'rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment,' . . . the district court . . . [is] under no obligation to undertake a cumbersome review of the record on the [nonmoving party's] behalf." Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010) (quoting Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996)). However, the district court "may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Further, "at this stage of the litigation, the judge does not . . . . make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions. These determinations are within the province of the factfinder at trial." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

3

**II.   UNCONTROVERTED FACTS**

The following facts concern the motion and are either undisputed or are "deemed" uncontroverted since they have not been controverted with specific facts as required by Local Rule 260(b).

"In June 2009, Plaintiffs purchased a California Motor Vehicle Insurance Policy [(the 'Policy')] from Progressive [for the Mustang], the terms of which included . . . fire and theft protection . . . ." (Pls.' Resp. to Def.'s Statement of Undisputed Material Facts ("UMF") No. 2, ECF No. 46-1.) "The Policy also provided that Progressive 'may deny coverage for an accident or loss if [the insured] has concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, in connection with the presentation or settlement of a claim.'" (UMF No. 7 (emphasis removed).)

"Plaintiffs reported the alleged theft of the Mustang to Progressive on the morning of December 3, 2009." (UMF No. 8.) Claims specialist Tara Flaherty handled their claim. (Flaherty Decl. ¶ 1.)

The night before, on December 2, 2009, at 11:45–50 PM, (Ex. 9 at 1098), "the King County Fire Department recovered [the Mustang] . . . after responding to a report of vehicle fire." (UMF No. 11.)

Progressive conducted an investigation of the claim, part of which includes an interview of Ivey on December 3, 2009 (the "December 3 interview"), (see UMF No. 23), and an interview of Reitz on December 4, 2009 (the "December 4 interview"). (See UMF No. 24.) Progressive again interviewed each Plaintiff on

4

December 22, 2009 (the "December 22 interview"). (See UMF No. 25.) And on March 22, 2010, Progressive conducted an examination of each Plaintiff under oath ("EUO"). (Flaherty Decl. ¶ 37.)

"On May 18, 2010, . . . Flaherty[] completed a final summary of the claim . . . and made a determination to deny coverage based on factual inconsistencies in the [claim's] presentation[,] . . . 'together with the timing of the events on the night of the alleged theft, [evidence involving] the transpondered key,[2] the complete burn [of the Mustang] with no stripping of the car, the cell phone activity, domestic tensions that became apparent during . . . [the] EUO's, and [Ivey's brother]'s refusal to cooperate in Progressive's investigation.'" (UMF No. 22; Flaherty Decl. ¶ 1.)

### III.  BREACH OF CONTRACT

Progressive argues its motion on Plaintiffs' breach of contract claim should be granted because it "properly determined that material misrepresentations by Plaintiffs voided coverage" under the Policy's fraud and concealment provision.[3] (Mot. 13:20-22.) Specifically, Progressive contends it denied coverage because of "numerous inconsistencies in [Plaintiffs'] accounts of the evening before [Plaintiffs] reported the [Mustang's] loss . . . [that have] led Progressive to conclude that

---

[2]   There was only one key. (UMF No. 9.)
[3]   Progressive also cites California Insurance Code section 2071, which provides in pertinent part: "This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact . . . ." Cal. Ins. Code § 2071. "By statute . . ., insurance policies providing fire insurance on California property must include the standard form provisions contained in [section] 2071 or provisions that are their substantial equivalent." H. Walter Croskey, et al. California Practice Guide: Insurance Litigation § 6:254 (Rutter Grp. 2015).

5

[Plaintiffs] had made material misrepresentations in connection with their claim." (Mot. 9:5-7.)

The following statements are undisputed or are "deemed" uncontroverted.[4]

Progressive asserts Reitz and Ivey gave inconsistent statements about when they came home on December 2, 2009, the night of the Mustang's loss. (Mot. 9:10-22.) Specifically, Progressive cites Ivey's December 3 interview, in which the following communication is recorded: Flaherty asked Ivey, "when you . . . came home, you said it was around 8:30 [PM]. . . . [W]as [Reitz] home at the time?" Ivey responded that Reitz was not home. (Ex. 3 at 1663; see UMF No. 23.) In his December 22 interview, Ivey stated he was in school "somewhere between 8:30 [PM] and 9:30 [PM]," and he believed he went straight home from school. (Ex. 20 at 1737; see UMF No. 26.) "At his EUO, Ivey stated that he arrived home sometime after 8:00 [PM] and that Reitz was home when he arrived." (UMF No. 27.)

In the December 4 interview, Reitz "stated that she got home at approximately 8:30 [PM], and Ivey arrived sometime after 10:00 [PM], when she was already in bed." (UMF No. 24.) In her December 22 interview, Reitz stated: "Ivey arrived home after she did, at 9:00 or 9:15 [PM], that she did not go to sleep until

---

[4] Plaintiffs make numerous objections to Progressive's evidence. However, a ruling on all objections is unnecessary since some of the objections concern matters immaterial to the motion. See Burrell v. Cnty. of Santa Clara, No. 11-CV-04569-LHK, 2013 WL 2156374, at *2 (N.D. Cal. May 17, 2013) (declining to reach evidentiary objections to evidence not relied upon in deciding summary judgment motion). Further, Progressive has requested judicial notice of three state court documents. This request is denied since Progressive has not shown that the referenced documents are relevant to decision on its motion. See Monica Food Not Bombs v. City of Santa Monica, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006) ("We decline to take judicial notice of the . . . [documents], as they are not relevant to the resolution of this appeal.").

1  10:00 [PM]." (UMF No. 25.) She also stated: "I remember [Ivey]
2  was home at . . . 9:00-ish or 9:45-ish." (Ex. 19 at 1695.) "In
3  her EUO, Reitz stated that she was up and awake when . . . Ivey
4  arrived home between 8:00 [PM] and 9:00 [PM]." (UMF No. 28.)

5  Progressive also cites inconsistent statements from
6  Ivey about when he last saw the Mustang. (Mot. 9:24-28, 10:1-2.)
7  "On December 3, 2009, the day Ivey allegedly discovered the
8  theft, Ivey told Progressive he last saw the Mustang between 9:30
9  and 9:45 [PM], when he went to retrieve cigarettes from the
10 vehicle." (UMF No. 29.) "Ivey told police that he last saw the
11 Mustang at 10:00 [PM]." (UMF No. 30.) "In his [California]
12 Affidavit of [Vehicle] Theft, Ivey said he last saw the Mustang
13 at 10:30 [PM]." (UMF No. 31.)

14 "In his December 22, 2009 statement, Ivey claimed he
15 last saw the Mustang . . . when he parked it upon arriving home
16 sometime after 8:00 [PM]. In his EUO, Ivey stated that he did not
17 remember going out to retrieve cigarettes from the Mustang on the
18 evening of the alleged theft, and did not think that he did."
19 (UMF No. 32.)[5]

20 Progressive further cites inconsistent statements Reitz
21 made about whether, on December 2, 2009, she heard the Mustang on
22 the night of its loss. (Mot. 10:3-12.) In her December 22
23 interview, "Reitz stated that she heard Ivey return home on the
24 night of December 2, 2009, because the Mustang has a loud
25 exhaust." (UMF No. 33.) In her EUO, the examiner asked Reitz:
26 "[D]o you remember hearing the engine that night?" (Ex. 34 at

---

[5] Plaintiffs object to the cited evidence in number 32 as "compound." (UMF 11:20-28.) This objection is overruled.

1835.) She responded: "I don't even know. I can't even say that. . . . But then, I don't want it to lead to where [Ivey] didn't drive the car home . . . ." (Id. at 1835.) "In his EUO, Ivey said that, although the Mustang had an aftermarket exhaust, it was not especially loud." (UMF No. 34.)

Progressive also argues Plaintiffs made inconsistent statements about who discovered the loss on December 3, 2009. (Mot. 10:13–20.) In the December 3 interview, "Ivey said that he discovered the loss when he went outside that morning to smoke. At the time, Reitz was inside getting ready for work, and Ivey went back inside to advise her of the loss." (UMF No. 36.)

In the December 4 interview, "Reitz said she did not remember who discovered the loss, but thought she noticed the Mustang was missing when she looked outside and saw it was not parked in its usual place." (UMF No. 37.) In her December 22 interview, Reitz said, "[Ivey] went out to his car to get the cigarettes and the car was gone." (Ex. 19 at 1699.)

Progressive also cites inconsistencies involving Plaintiffs' text messages on the night of the Mustang's loss.

Plaintiffs object to Progressive's use of Plaintiffs' text messages, arguing this evidence lacks foundation. (UMF 13:18–23; UMF No. 39.) Specifically, Flaherty declares that "[b]etween 8:54 [PM] and 12:26 [AM], there were 17 text messages between Rietz and Ivey's cell phone." (Flaherty Decl. ¶ 36.) Progressive argues this evidence should be considered because "Flaherty . . . has demonstrated her competency to testify about the contents of the claim file." (Def.'s Reply to Opp'n ("Reply") 6:2–4.) Although Flaherty has shown she has personal knowledge of

8

1  Plaintiffs' claim file, (see Flaherty Decl. ¶¶ 1-4), Progressive
2  has not shown that she has personal knowledge of the cell tower
3  records from Plaintiffs' carriers that are attached to her
4  declaration, and which include the text messaging evidence. See
5  Orr v. Bank of Am., NT & SA, 285 F.3d 764, 778 (9th Cir. 2002)
6  ("The district court properly found that Exhibit Q was not
7  authenticated because Orr introduced the letter by attaching it
8  to [the affiant]'s affidavit [but the affiant] lacks personal
9  knowledge of the letter."). Therefore, Plaintiffs' foundation
10 objection to this text messaging evidence is sustained.

11         Progressive also relies on the following uncontroverted
12 facts in number 41: "Although Reitz initially said that she was
13 half asleep in bed when Ivey got home, she later testified that
14 she called Progressive two times to make sure her payment went
15 through and made a telephone payment on the car after he came
16 home." (UMF No. 41.) Plaintiffs make a hearsay objection to this
17 evidence which is overruled because Plaintiffs have not shown
18 this evidence is hearsay. See Fed. R. Evid. 801(d)(2)(A)
19 (opposing party's statements are admissible as non-hearsay when
20 "offered against an opposing party").

21         Plaintiffs argue that notwithstanding the referenced
22 inconsistencies, "Progressive has not shown that these
23 'inconsistencies' amount to justification for refusing to . . .
24 indemnif[y Plaintiffs] under the [P]olicy." (Pls.' Opp'n to Mot.
25 ("Opp'n") 3:16–18, ECF No. 46.)

26         An insurer may deny coverage under a policy's fraud and
27 concealment provision, if an insured's misrepresentation (1)
28 concerns a material matter and (2) was "knowingly and

9

intentionally made with knowledge of its falsity and with intent of defrauding the insurer." Cummings v. Fire Ins. Exch., 202 Cal. App. 3d 1407, 1416–17 (1988) (emphasis removed) (citations omitted).

An insured's misrepresentation relates to a material matter if it "concerns a subject reasonably relevant to the insure[r]'s investigation, and if a reasonable insurer would attach importance to the fact misrepresented." Id. at 1417. "[M]ateriality is a mixed question of law and fact that can be decided as a matter of law if reasonable minds could not disagree on the materiality of the misrepresentations." Id.

"[W]hether a false statement was made knowingly and with the intent to deceive the insurer is usually a question of fact but may be decided as a matter of law where the insured admits that he made knowingly false statements with the intent that the insurer rely upon them." Ram v. Infinity Select Ins., 807 F. Supp. 2d 843, 853 (N.D. Cal. 2011) (citations omitted). Further, "the intent to defraud the insurer is necessarily implied when the misrepresentation is material and the insured willfully makes it with knowledge of its falsity." Cummings, 202 Cal. App. 3d at 1418.

Progressive argues that Plaintiffs' inconsistent statements involve material matters since "[their statements] affected the timing of the alleged theft, which had to have occurred within an implausibly small window of time." (Mot. 14:20–22.)

However, Progressive has not shown the absence of a genuine issue of material fact on the issue of whether any

statement a Plaintiff made was made "with knowledge of its falsity and with intent of defrauding [Progressive]." Cummings, 202 Cal. App. 3d at 1417. Therefore, Progressive's motion on Plaintiffs' breach of contract claim is denied.

## IV.  BAD FAITH CLAIM

Progressive argues it is entitled to summary judgment on Plaintiffs' breach of the implied covenant of good faith and fair dealing ("bad faith") claim, because "a genuine dispute existed as to coverage." (Mot. 16:3-6.) Progressive further argues, *inter alia*, "the factual inconsistencies in Plaintiffs' narrative of the events on the night of the loss . . . [and] the [North American Technical and Forensic Services ("]NATS[")] report," which it obtained on the coverage issue, establish a genuine dispute as to its liability under the Policy, and Progressive's investigative record shows it "conducted a reasonable and thorough investigation of Plaintiffs' claim." (Mot. 16:4-6, 17:14-15.)

Plaintiffs counter that Progressive did not "fully and fairly investigate[] [Plaintiffs'] claim[]." (Opp'n 6:7-23.)

Further, Plaintiffs make numerous objections to evidence involved with Progressive's investigation. Specifically, Plaintiffs object on foundation grounds to paragraph five of Flaherty's Declaration, where she discusses the steps taken to investigate Plaintiffs' claim. (UMF 7:17-24; see UMF No. 18 (citing Flaherty Decl. ¶ 5).) This objection is overruled since Progressive has shown Flaherty handled Plaintiffs' claim and that she has personal knowledge of the referenced investigative steps. (Flaherty Decl. ¶¶ 1-4.)

11

1          Plaintiffs further object to the admissibility of the
2   NATS report, on the following grounds: compound, lacks
3   foundation, unqualified opinion testimony, and hearsay. (UMF 8:7-
4   8; UMF No. 19.) Progressive responds "Flaherty . . . has
5   demonstrated her competency to testify about the contents of the
6   claim file." (Def.'s Reply to Opp'n ("Reply") 6:2-4.) It further
7   responds that "the underlying statements [in the claim file] are
8   not hearsay because they are offered to show their effect upon
9   Progressive's investigation and evaluation of Plaintiffs' claim."
10  (Reply 5:28, 6:1-2.)

11         Plaintiffs' compound objection is overruled.
12  Plaintiffs' foundation objection is also overruled since Flaherty
13  declares "Progressive obtained a report from [NATS]," and the
14  NATS report is addressed to Flaherty and Progressive. (Flaherty
15  Decl. ¶ 30; Ex. 27 at 1331.)

16         Further, the NATS report is not hearsay since
17  Progressive offers it for its effect upon Progressive in
18  evaluating Plaintiffs' claim, rather than for the truth of the
19  opinions expressed therein. See Fed. R. Evid. 801(c) (stating the
20  rule concerns evidence offered "to prove the truth of the matter
21  asserted in the statement"). Nor have Plaintiffs shown that what
22  they contend are unqualified opinions in the NATS report
23  constitutes a meritorious objection in light of how Progressive
24  asserts it considered that evidence. Therefore, Plaintiffs'
25  hearsay and unqualified opinion testimony objections to the NATS
26  report are overruled.

27
28

The NATS report "noted that the Mustang was electronically protected by an OEM[6] transponder-based antitheft system and concludes there was no evidence of engine tampering, that the Mustang's ignition lock/column Jock/starter switch assembly had not been compromised or otherwise defeated, and that nothing other than a properly cut mechanical key had been used to rotate the ignition lock core." (UMF No. 19.)

"[T]o establish a breach of the implied covenant of good faith and fair dealing under California law, a plaintiff must show: (1) benefits due under the policy were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause." Guebara v. Allstate Ins. Co., 237 F.3d 987, 992 (9th Cir. 2001).

Moreover, "a court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability." Lunsford v. Am. Guarantee & Liab. Ins. Co., 18 F.3d 653, 656 (9th Cir. 1994) (citation omitted). Further, "an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract." Wilson v. 21st Century Ins. Co., 42 Cal. 4th 713, 723 (2007) (citation omitted)). "A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." Id. In addition, "[t]he genuine dispute rule

---

[6] "OEM" likely means "Original Equipment Manufacturer," but Progressive has not defined this term.

13

does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim." Id.

Plaintiffs also argue that Progressive's investigation was deficient because Progressive did not "attempt to determine if the Mustang had been towed or hauled away on a flatbed truck, which would have offered a harmless explanation for the 'inconsistencies' Progressive relied upon to deny the claim." (Opp'n 5:17-23.) However, Flaherty declares: "[I]t did not make sense that a thief would steal the Mustang (presumably by having it towed . . . away), only to set fire to it within a very short time and without stripping it of valuable parts." (Flaherty Decl. ¶ 42.)

Progressive has shown that its denial of Plaintiffs' claim was not unreasonable since "there existed a genuine issue as to [its] liability," Lunsford, 18 F.3d at 656, and therefore, Progressive's summary judgment motion on Plaintiffs' bad faith claim is granted.

### V.  DAMAGES ISSUES

Progressive requests "an order specifying for the purpose of trial that Plaintiffs are not entitled to damages over the liability limit specified in the [Policy]." (Mot. 3:27-28.) Rule 56(g) authorizes, but does not require, the order requested by Progressive as follows: "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

Progressive argues: "There is no evidence that [portions of] the damages [Plaintiffs seek in their Complaint] were contemplated by the parties at the time of contracting," and hence such damages are not recoverable. (Mot. 21:23–24.) Concerning this, Plaintiffs allege as follows in their Complaint:

> Reitz and Ivey suffered damages, <u>contemplated by the Policy</u>, in that they were unable to replace the Mustang, they were accused of and prosecuted for criminal activity, they were subjected to arrest and detention, they lost past and future income, and lost the bargained for peace and security of knowledge that their financial losses covered by the Policy would be indemnified by Progressive, all to their damages in the sum of nine million, nine hundred fifty thousand dollars ($9,950,000.00) or according to proof.

(Compl. ¶ 19, ECF No. 1 (emphasis added).)

Progressive asserts that under the Policy between Plaintiffs and Progressive, "[t]he relevant limit of liability . . . for loss to a covered auto was 'the actual cash value of the stolen or damaged property at the time of loss reduced by the applicable deductible.'" (UMF No. 5; see also UMF No. 3 (discussing the Policy's terms).)

Plaintiffs counter that Progressive "has not offered . . . evidence to support its contention that the parties contemplated nothing more than casualty damages." (Opp'n 7:6–9.)

"Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at the time; consequential damages beyond the expectations of the parties are not recoverable." <u>Erlich v. Menezes</u>, 21 Cal. 4th 543, 558 (1999) (citations omitted).

15

Plaintiffs have not shown the existence of a genuine disputed issue of fact on whether the parties contemplated damages beyond the Policy's liability limit set forth in the Policy, and in light of the pled contract-based claim.[7] Therefore, Progressive's request for an order specifying that Plaintiffs are not entitled to damages over the liability limit specified in the Policy is granted. See Fed. R. Civ. P. 56(g) (stating: "If the court does not grant all the relief requested by the motion, it may . . . treat[] the fact as established in the case"). Progressive also seeks an order specifying for the purpose of trial that "Plaintiffs are not entitled to damages for emotional distress or mental suffering because such damages were not proximately caused by [P]rogressive's alleged breach of its contractual duties." (Mot. 3:22–24.) Plaintiffs do not oppose this portion of the motion, and the undisputed facts establish that the Policy's liability limit only provides for contractual compensatory damages for the Mustang's actual cash value (minus the applicable deductible).

---

[7] In their Opposition Brief to Progressive's previous motion to dismiss, Plaintiffs admitted their Complaint "pleads a cause of action for breach of a contractual promise to . . . investigate claims in good faith," meaning Plaintiffs based their bad faith claim in contract. (Pls.' Opp'n to Def.'s Mot. to Dismiss Pls.' Compl. 5:4–14, ECF No. 4 (emphasis added).) However, Plaintiffs also indicated in that Opposition Brief that they may also have alleged a tort claim as follows: "There is no indicia in the complaint as to the time the tort cause of action accrued because it is not clear when the tort damages accrued." (Id. at 6:21–23.) The Court subsequently dismissed Plaintiffs' tort-based bad faith claim on statute of limitations grounds, and granted Plaintiffs leave to amend that claim,(Order Granting in Part and Den. in Part Mot. to Dismiss, ECF No. 7), but Plaintiffs did not timely file a successful amendment. Although Plaintiffs subsequently filed a First Amended Complaint, that amended complaint was stricken since it only amended the existing contract claim without having leave. (Order Granting Def.'s Mot. to Strike Pls.' First Am. Compl., ECF No. 23.) Plaintiffs admitted this by stating: their "First Amended Complaint does not sound in tort in any manner whatsoever. It is clearly and explicitly an action for breach of contract." (Pls.' Opp'n to Def.'s Mot. to Strike First Am. Compl. 2:18-19, ECF No. 11.)

**VI. CONCLUSION**

For the stated reasons, Progressive's motion is DENIED in part and GRANTED in part.

Dated: October 20, 2015

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge